UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED
DEC 17 2014
David J. Bradley, Clerk of Court

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ALIKSANDR BEKETAV,<br>    a/k/a "Sasha,"<br>    a/k/a "Aliksandr Beketau,"<br>    a/k/a "Aleksandr Beketav,"<br>MIKHAIL SHIFORENKO,<br>    a/k/a "Mike Shifka,"<br>    a/k/a "Mike Shifa,"<br>ALEXSANDR VORONOV,<br>    a/k/a "Sasha,"<br>    a/k/a "Aleksandr Voronov,"<br>    a/k/a "Makhachkala," and<br>DANIELA GOZES-WAGNER,<br>    a/k/a "Daniela Wagner,"<br>    a/k/a "Daniela Mayer Gozes,"<br>    a/k/a "Daniela Gozes,"<br><br>       Defendants. | Criminal No. 14-637<br><br>**Sealed**<br>Public and unofficial staff access to this instrument are prohibited by court order. |

## INDICTMENT

THE GRAND JURY CHARGES THAT:

### Background

At all times material to this Indictment:

    1.    The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were over the age of 65 or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the U.S. Department of Health and Human Services.

1

2. Medicare "beneficiaries" were individuals who qualified for and received Medicare benefits. Each beneficiary was given a Medicare identification number.

3. Medicare was subdivided into multiple Parts. Medicare Part B helped to pay for certain physician services, outpatient services, and other services, including diagnostic tests, that were medically necessary, and that were ordered by licensed doctors or other qualified health care providers.

4. Although Medicare was a federal program, private insurance organizations called intermediaries or carriers contracted with Medicare to process and pay claims submitted by health care providers. Trailblazer Health Enterprises, LLC, of Dallas, Texas, and Novitas Solutions, Inc., had entered into contracts with Medicare to administer the Medicare Part B program for Texas.

5. The Texas Medicaid Program ("Medicaid"), which was also overseen by CMS, was a state-administered health insurance program funded by the United States Government and the State of Texas. Medicaid was a cooperative federal-state program to furnish medical assistance to the indigent. Medicaid helped to pay for reasonable and necessary medical procedures, including diagnostic tests, provided to individuals and families deemed eligible under state programs for persons with low income.

6. Medicaid "beneficiaries" are individuals who qualified for and received Medicaid benefits.

7. The State of Texas contracted with Texas Medicaid & Healthcare Partnership ("TMHP") to process and pay claims for services rendered to Medicaid beneficiaries.

8. Medicare and Medicaid were "health care benefit program[s]" as defined by 18 U.S.C. § 24(b).

2

9. "Providers" were physicians and other health care providers who provided services to Medicare and/or Medicaid beneficiaries. In order to bill Medicare, Providers were required to submit an application in which they agreed to comply with all Medicare-related laws and regulations. Similarly, to bill Medicaid, Providers were required to submit an application in which they agreed to comply with all Medicaid-related laws and regulations. A Medicare "provider number" was assigned to a Provider upon approval of the Provider's Medicare application. A Provider could use that provider number to file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

10. When a patient was a beneficiary of both traditional Medicare and Medicaid, a claim for diagnostic tests initially submitted to Medicare would be sent to Medicaid, which would pay a portion of the claim, typically constituting 20 percent of the Medicare allowance for a particular billed charge. Where a patient was solely a Medicaid beneficiary, claims would be submitted directly to Medicaid.

### Defendants and Relevant Entities

11. ALIKSANDR BEKETAV (a/k/a Sasha, a/k/a Aliksandr Beketau, a/k/a Aleksandr Beketav) oversaw the fraudulent scheme charged in this indictment and was the de facto owner of various facilities that purportedly provided diagnostic testing for Medicare and Medicaid beneficiaries.

12. MIKHAIL SHIFORENKO (a/k/a Mike Shifka, a/k/a Mike Shifa) assisted BEKETAV in overseeing the fraudulent scheme and helped run various facilities that purportedly provided diagnostic testing for Medicare and Medicaid beneficiaries.

13. ALEXSANDR VORONOV (a/k/a Sasha, a/k/a Aleksandr Voronov, a/k/a Makhachkala) assisted BEKETAV in overseeing the fraudulent scheme, particularly in the

Houston area, and helped run various facilities that purportedly provided diagnostic testing for Medicare and Medicaid beneficiaries.

14. DANIELA GOZES-WAGNER (a/k/a Daniela Wagner, a/k/a Daniela Mayer Gozes, a/k/a Daniela Gozes) helped run various facilities in the Houston area that purportedly provided diagnostic testing for Medicare and Medicaid beneficiaries.

15. Dashwood Doctors Medical Clinic (5420 Dashwood Drive, Suite 200, Houston, Texas), which was run by defendants, purportedly provided diagnostic testing to Medicare and Medicaid Beneficiaries.

16. Southwest Healthcare & Diagnostics (6065 Hillcroft Street, Suite 107, Houston, Texas, and later 7100 Regency Square, Suite 140, Houston, Texas), which was run by defendants, purportedly provided diagnostic testing to Medicare Beneficiaries.

17. Harwin Healthcare & Diagnostic (7457 Harwin, Suite 210, Houston, Texas), which was run by defendants, purportedly provided diagnostic testing to Medicare Beneficiaries.

18. Hilcroft Healthcare & Diagnostic (7111 Harwin, Suite 216, Houston, Texas), which was run by defendants, purportedly provided diagnostic testing to Medicare Beneficiaries.

19. Gulfton Healthcare, Inc. (6065 Hillcroft Street, Suite 306, Houston, Texas, and later 2470 Gray Falls Drive, Suite 215, Houston, Texas), which was run by defendants, purportedly provided diagnostic testing to Medicare Beneficiaries.

20. Westpark Healthcare & Diagnostics (9950 Westpark Drive, Suite 626, Houston, Texas), which was run by defendants, purportedly provided diagnostic testing to Medicare Beneficiaries.

21. Village Diagnostic Clinic, Inc. (10101 Harwin Drive, Suite 194, Houston, Texas), which was run by defendants, purportedly provided diagnostic testing to Medicare and Medicaid Beneficiaries.

22. 7111 Medical Clinic, Inc. (2470 Gray Falls Drive, Suite 215, Houston, Texas), which was run by defendants, purportedly provided diagnostic testing to Medicare and Medicaid Beneficiaries.

## COUNT ONE
### Conspiracy to Commit Health Care Fraud

23. From at least in or about January 2007, and continuing until the present, in the Southern District of Texas and elsewhere, the defendants

**ALIKSANDR BEKETAV,**
a/k/a "Sasha,
a/k/a "Aliksandr Beketau,"
a/k/a "Aleksandr Beketav,"
**MIKHAIL SHIFORENKO,**
a/k/a "Mike Shifka,"
a/k/a "Mike Shifa,"
**ALEXSANDR VORONOV,**
a/k/a "Sasha,"
a/k/a "Aleksandr Voronov,"
a/k/a "Makhachkala," and
**DANIELA GOZES-WAGNER,**
a/k/a Daniela Wagner,
a/k/a Daniela Mayer Gozes,
a/k/a Daniela Gozes

did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to violate 18 U.S.C. § 1347 (health care fraud), that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), namely Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and

5

under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items and services.

## Purpose of the Conspiracy

24. It was a purpose of the conspiracy that the defendants, and other persons known and unknown to the Grand Jury would and did unlawfully enrich themselves by submitting claims for reimbursement to Medicare and/or Medicaid, fraudulently representing that certain services had been provided to beneficiaries consistent with Medicare and Medicaid requirements when, in fact, defendants well knew that the services had not been performed or were not medically necessary.

## Manner and Means of the Conspiracy

The manner and means by which defendants and their co-conspirators sought to accomplish the purpose and object of the conspiracy included, among others, the following:

25. Defendants established entities (including those listed in paragraphs 15-22 above) that purported to provide diagnostic testing to Medicare and Medicaid Beneficiaries (the "Testing Facilities").

26. Defendants often attempted to conceal their association with the Testing Facilities by causing other people to be listed as the owners or operators of the facilities on various documents, although defendants, rather than the nominal owners, received much of the money earned.

27. To give the appearance that the Testing Facilities were conducting legitimate diagnostic testing, defendants caused purported diagnostic testing technicians to be employed by the facilities, despite knowing that the purported technicians were not properly trained, licensed, qualified, or supervised.

28. Defendants also caused the Testing Facilities to employ medical professionals such as nurse practitioners and doctors to represent that they were supervising the technicians and the operation of the facilities, even though defendants knew that the medical professionals were not providing meaningful supervision and were, in fact, simply acting as a "rubber stamp" to allow defendants to submit bills to Medicare and Medicaid.

29. Defendants recruited Medicare and/or Medicaid beneficiaries to visit the Testing Facilities for purported diagnostic testing by paying the beneficiaries either directly or through intermediaries.

30. Defendants caused Medicare and/or Medicaid to be billed for diagnostic tests purportedly performed on beneficiaries who visited the Testing Facilities even though defendants knew that the billed tests were not performed on the beneficiaries, or that the tests were not medically necessary, but rather were solely performed in order to "justify" billing Medicare/Medicaid.

31. Defendants also caused employees of the Testing Facilities to visit purportedly homebound beneficiaries, in order to purportedly conduct diagnostic tests on the beneficiaries at their homes. Defendants often obtained access to such beneficiaries through collusive arrangements with home health care agencies.

32. Defendants caused Medicare and/or Medicaid to be billed for diagnostic tests purportedly performed on homebound beneficiaries even though defendants knew that the billed tests were not performed on the beneficiaries, or that the tests were not medically necessary, but rather were solely performed in order to "justify" billing Medicare/Medicaid.

33. Defendants caused Medicare and/or Medicaid to be billed for the following types diagnostic tests (among others) purportedly performed by the Testing Facilities even though the tests were not performed or were not medically necessary:

   a. Dashwood Doctors Medical Clinic—nerve conduction, percutaneous allergy, membrane diffusion capacity, and carbon monoxide diffusion;

   b. Southwest Healthcare & Diagnostics—echocardiography, duplex artery and vein scan, and nerve conduction;

   c. Harwin Healthcare & Diagnostic—echocardiography, nerve conduction, percutaneous allergy, duplex artery and vein scan, and abdominal ultrasound;

   d. Hilcroft Healthcare & Diagnostic—echocardiography, nerve conduction, somatosensory evoked potential study, percutaneous allergy, duplex artery and vein scan, and abdominal ultrasound;

   e. Gulfton Healthcare, Inc.—echocardiography, percutaneous allergy, duplex artery and vein scan, and nerve conduction;

   f. Westpark Healthcare & Diagnostics—percutaneous allergy, nerve conduction, echocardiography, duplex artery and vein scan, and anorectal manometry;

   g. Village Diagnostic Clinic, Inc.—percutaneous allergy, echocardiography, nerve conduction, and duplex artery and vein scan; and

   h. 7111 Medical Clinic, Inc.—percutaneous allergy, nerve conduction, echocardiography.

34. Defendants and employees of the Testing Facilities rarely—if ever—followed up with the beneficiaries to provide them their test results or any medical care.

8

35. In order to avoid detection of their fraud, and to expedite their fraudulent payments, defendants would frequently change the identities of the Testing Facilities and/or medical professionals listed in the bills submitted to Medicare/Medicaid. For example, if bills submitted to Medicare listing a particular doctor drew scrutiny from reviewing officials, defendants would cause that doctor's name to be removed from future submissions, and for another doctor's name to be substituted on the bill.

36. For claims related to Dashwood Doctors Medical Clinic, defendants caused Medicare to be billed approximately $4,995,865, of which $1,839,771 was paid; defendants caused Medicaid to be billed $2,477,736, of which $281,306 was paid.

37. For claims related to Southwest Healthcare & Diagnostics, defendants caused Medicare to be billed approximately $2,670,510, of which $1,014,709 was paid.

38. For claims related to Harwin Healthcare & Diagnostic, defendants caused Medicare to be billed approximately $3,055,555, of which $1,193,231 was paid.

39. For claims related to Hilcroft Healthcare & Diagnostic, defendants caused Medicare to be billed approximately $1,389,190, of which $686,876 was paid.

40. For claims related to Gulfton Healthcare, Inc., defendants caused Medicare to be billed approximately $5,614,425, of which $2,770,326 was paid.

41. For claims related to Westpark Healthcare & Diagnostics, defendants caused Medicare to be billed approximately $371,170, of which $178,350 was paid.

42. For claims related to Village Diagnostic Clinic, Inc., defendants caused Medicare to be billed approximately $3,500,779, of which $1,647,528 was paid; defendants caused Medicaid to be billed $160,117, of which $4,686 was paid.

43. For claims related to 7111 Medical Clinic, Inc., defendants caused Medicare to be billed approximately $3,769,201, of which $1,822,041 was paid; defendants caused Medicaid to be billed $56,280, of which $1,525 was paid.

44. Defendants caused bank accounts in the names of various entities, including the Testing Facilities, to be opened at various financial institutions. Defendants caused payments received from Medicare and Medicaid (including, among others, payments for services purportedly rendered by the Testing Facilities) to be moved among these various accounts before being disbursed to defendants and their co-conspirators.

45. Defendant ALIKSANDR BEKETAV received, or caused to be distributed to members of his immediate family, at least $1.68 million of the defendants' fraudulently obtained Medicare/Medicaid payments.

46. Defendant MIKHAIL SHIFORENKO received at least $1.19 million of the defendants' fraudulently obtained Medicare/Medicaid payments.

47. Defendant ALEXSANDR VORONOV received at least $973,000 of the defendants' fraudulently obtained Medicare/Medicaid payments.

48. Defendant DANIELA GOZES-WAGNER received at least $54,523 of the defendants' fraudulently obtained Medicare/Medicaid payments.

All in violation of 18 U.S.C. § 1349.

## COUNT TWO
### Conspiracy to Commit Money Laundering

49. From at least in or about January 2007, and continuing until the present, in the Southern District of Texas and elsewhere, the defendants

**ALIKSANDR BEKETAV,**
a/k/a "Sasha,
a/k/a "Aliksandr Beketau,"

a/k/a "Aleksandr Beketav,"
MIKHAIL SHIFORENKO,
a/k/a "Mike Shifka,"
a/k/a "Mike Shifa," and
ALEXSANDR VORONOV,
a/k/a "Sasha,"
a/k/a "Aleksandr Voronov,"
a/k/a "Makhachkala"

did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to conduct financial transactions which involved proceeds of a specified unlawful activity, to wit health care fraud, in violation of 18 U.S.C. § 1347, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, all in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

## Manner and Means of the Conspiracy

The manner and means by which defendants and their co-conspirators sought to accomplish the purpose and object of the conspiracy included, among others, the following:

50. Defendants and their co-conspirators fraudulently billed Medicare and Medicaid as alleged in paragraphs 23-43 above.

51. As described in paragraphs 44-48, defendants caused bank accounts in the names of various entities, including the Testing Facilities, to be opened at various financial institutions. Defendants often attempted to conceal their association with the accounts by causing other people to be listed as the owners of the accounts.

52. Defendants caused payments received from Medicare and Medicaid on the basis of the fraudulent scheme charged in Count One to be moved among various accounts before ultimately being disbursed to defendants and their co-conspirators.

All in violation of 18 U.S.C. § 1956(h).

## NOTICE OF CRIMINAL FORFEITURE
28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C)

53. Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to the defendants,

ALIKSANDR BEKETAV,
a/k/a "Sasha,
a/k/a "Aliksandr Beketau,"
a/k/a "Aleksandr Beketav,"
MIKHAIL SHIFORENKO,
a/k/a "Mike Shifka,"
a/k/a "Mike Shifa,"
ALEXSANDR VORONOV,
a/k/a "Sasha,"
a/k/a "Aleksandr Voronov,"
a/k/a "Makhachkala," and
DANIELA GOZES-WAGNER,
a/k/a Daniela Wagner,
a/k/a Daniela Mayer Gozes,
a/k/a Daniela Gozes

that in the event of conviction of the offense charged in Count One of this Indictment, all property, real or personal, which constitutes or is derived from proceeds traceable to such offense is subject to forfeiture.

## NOTICE OF CRIMINAL FORFEITURE
18 U.S.C. § 982(a)(1)

46. Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to the defendants,

ALIKSANDR BEKETAV,
a/k/a "Sasha,
a/k/a "Aliksandr Beketau,"
a/k/a "Aleksandr Beketav,"
MIKHAIL SHIFORENKO,
a/k/a "Mike Shifka,"
a/k/a "Mike Shifa," and
ALEXSANDR VORONOV,

a/k/a "Sasha,"
a/k/a "Aleksandr Voronov,"
a/k/a "Makhachkala"

that in the event of conviction of the offense charged in Count Two of this Indictment, all real and personal property involved in such money laundering offense or traceable to such property is subject to forfeiture.

**Money Judgment**

47. Defendants are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture, for which the defendants may be jointly and severally liable. That amount is estimated to be, but is not limited to, approximately $11,440,349 in United States currency.

**Property Subject to Forfeiture**

48. Defendants are notified that the property subject to forfeiture includes, but is not limited to, $11,440,349 in United States currency.

49. Defendants are notified that in the event that property subject to forfeiture, as a result of any act or omission of defendants:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property that cannot be divided without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the defendants up to the total value of such property pursuant to Title 21, United States Code, Section 853(p),

incorporated by reference in Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1).

A TRUE BILL:

ORIGINAL SIGNATURE ON FILE
FOREPERSON OF THE GRAND JURY

KENNETH MAGIDSON
United States Attorney

By:

MICHAEL CHU
Assistant United States Attorney